FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

2019 JUN 25  P 3 00

CLERK US DISTRICT COURT
ALEXANDRIA VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | Case No.: 1:19-CV-849 |
| | ) | |
| *ex rel.* KEVIN CHEN and | ) | Judge: AJT/MSN |
| LAUREL RIGSBEE, | ) | |
| | ) | **COMPLAINT** |
| Plaintiffs-Relators | ) | **AND JURY DEMAND** |
| | ) | |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| DELOITTE & TOUCHE LLP, | ) | pursuant to 31 U.S.C. § 3730(b)(2) |
| DELOITTE CONSULTING LLP, and | ) | |
| DELOITTE LLP | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

Mark Hanna (Virginia Bar No. 45442)
Roseann R. Romano
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
Phone: (202) 223-2620
Fax: (202) 296-9600
*mhanna@murphypllc.com*
*rromano@murphypllc.com*

**Attorneys for Plaintiffs-Relators**

## COMPLAINT

1.      This is an action filed under the qui tam provisions of the False Claims Act,

31 U.S.C. § 3729 *et seq.*, by Plaintiffs-Relators Kevin Chen and Laurel Rigsbee, on

behalf of the United States of America and themselves, arising from false and/or

fraudulent records, statements, and claims made, used, presented, and caused to be made,

used, or presented by Defendants Deloitte & Touche LLP, Deloitte Consulting LLP, and

Deloitte LLP ("Deloitte") and its affiliated or owned entities, agents, employees, and co-

conspirators.

2.      Defendants systematically defraud the United States by encouraging, and in

many cases, requiring their employees to engage in fraudulent practices that have the

effect of improperly allocating internal costs to government contracts. This practice

violates the Federal Acquisition Regulations and applicable Cost Accounting Standards.

Deloitte inappropriately inflates the indirect cost rate that it charges on federal projects,

costing the federal government millions of dollars each year.

3.      Beyond the significant financial cost to the government, Deloitte's conduct

has serious implications for the entire federal contracting industry. As one of the Big

Four accounting and professional services firms, Deloitte's disregard for federal

contracting regulations and accounting principles undermines the legitimacy and integrity

of the federal contracting industry and has the potential to influence the behavior of other

firms.

1

4.      Specifically, Defendants' fraudulent scheme involves intentionally improperly allocating costs to the general and administrative cost pool, which falsely increases its indirect cost rate. Defendants accomplish this in three main ways:

> (a) allocating unallowable direct costs to the general and administrative pool;
>
> (b) misallocating allowable indirect costs to the general and administrative pool; and
>
> (c) allocating or misallocating expenses to the general and administrative pool.

5.      Defendants are engaging in continuous and ongoing violations of the False Claims Act by maintaining false or fraudulent records of costs incurred with regard to federal contract work; presenting such records to the government as claims for payment; and falsely certifying compliance with the applicable federal contracting regulations, including certifications required under 48 C.F.R. § 42.705-1(b)(1).

6.      By presenting false or fraudulent records in support of claims for payment, Defendants cause the government to overpay for contract work.

## JURISDICTION AND VENUE

7.      This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

8.      This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331. The False Claims Act confers nationwide jurisdiction and venue.

9. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service, because acts prohibited by 31 U.S.C. § 3729 occurred in this state, this judicial district, and division. Defendants can be found, reside, or transact or have transacted business in Arlington, Virginia, within the Eastern District of Virginia, Alexandria Division.

10. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because Defendants regularly transact or has transacted business in this District and did so at all times relevant to this Complaint and Defendants maintain offices in this jurisdiction. One or more acts proscribed in 31 U.S.C. § 3729 occurred in this District, including but not limited to, false or fraudulent billing for contract work with federal government agencies.

11. As required by 31 U.S.C. § 3730(b)(2), a written disclosure of substantially all material evidence and information in Relators' possession was served on the Government on May 16, 2019, *in camera* and under seal by delivering material evidence and information to the United States Attorney for the Eastern District of Virginia and the Defense Contract Audit Agency Inspector General.

12. In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed under seal and will remain under seal for a period of at least 60 days from its filing date or such date as is required by law or the Court so orders, and shall not be served upon Defendants unless the Court so orders.

## PARTIES

### A. Plaintiff-Relator Chen

13.    Kevin Chen is an experienced audit, controls, compliance, and risk management professional. He is a Certified Information Systems Auditor and a Certified Fraud Examiner.  He worked for Deloitte subsidiary Deloitte & Touche LLP from October 2005 to December 2007 and, as a Federal Advisory Manager, from November 2010 to August 2017. Between January 2008 and October 2010, Chen worked for Deloitte member firms in Ukraine and New Zealand. Within Deloitte's federal contracting practice, Chen oversaw various federal contract projects, including work for USAID, the U.S. Patent and Trademark Office, the Department of Transportation, the Centers for Disease Control and Prevention, the Department of the Interior, and the Department of State.

14.    Chen obtained his Bachelor of Arts in Political Science from the Pennsylvania State University in 1994, his Master's in Public Administration from the State University of New York in Albany in 1997, and his Master's in Business Administration from Rensselaer Polytechnic Institute in 2002. Prior to joining Deloitte, Chen worked as a Senior Budget Analyst for the New York State Division of the Budget.

15.    Chen's knowledge of the facts alleged herein was obtained through his direct experience during his employment with Deloitte's federal contracting practice group. He has extensive knowledge of Deloitte's contracting and billing practices, including locations of many relevant documents and witnesses. His observations and

conclusions are informed by his experience as a compliance, audit, and anti-fraud professional.

**B. Plaintiff-Relator Rigsbee**

16.     Laurel Rigsbee is a Manager for the Analytics and Information Management team with Deloitte's member firm in the Czech Republic. She has extensive experience with data analytics and risk management. Rigsbee worked for Deloitte & Touche's federal contracting practice group as a Senior Consultant from November 2013 to October 2016. Her federal clients included the U.S. Postal Service, USAID, and the Centers for Disease Control and Prevention.

17.     Rigsbee's knowledge of the facts alleged herein was obtained through her direct experience during the course of her employment with Deloitte's federal contracting practice group. Her observations and conclusions are informed by her experience as a risk management and analytics professional.

**C. Deloitte Defendants**

18.     Deloitte LLP is United States' member firm of Deloitte Touche Tohmatsu Limited, a United Kingdom private company limited by guarantee. Deloitte and its subsidiaries operate throughout the United States. It is incorporated in Delaware and its corporate headquarters is located at 1633 Broadway, New York, New York 10019.

19.     Defendants provide accounting and professional services in a variety of sectors. In Fiscal Year 2018, Deloitte LLP brought in nearly $20 billion in revenue in the United States alone.

5

20.     Deloitte's subsidiaries Deloitte & Touche LLP and Deloitte Consulting LLP perform substantially all of the firm's federal contracting work. Deloitte earns over $1.5 billion in federal contracting revenue each year. Deloitte's federal practice has its place of business in Arlington, Virginia.

21.     For federal contracting purposes, one Deloitte LLP subsidiary such as Deloitte & Touche LLP takes the lead in preparing contract bids, while other subsidiaries such as Deloitte Consulting LLP and Deloitte Tax LLP provide support behind the scenes. Upon information and belief, the lead subsidiary (in this example, Deloitte & Touche LLP) is named as the awardee in federal contract documents.

22.     Deloitte Defendants, as the term is used throughout this Complaint, encompasses Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte LLP, and any and all Deloitte-owned and related entities, including separately incorporated affiliates and subsidiaries, performing work on federal contracts.

## APPLICABLE LAW

### A. The Federal Acquisition Regulations

23.     The Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§1.000 *et seq.*, set forth detailed rules specifying how a federal contractor is to measure, accumulate, allocate, assign, and otherwise account for the costs it incurs in performing government contracts. The FAR also specifies which categories of cost are allowable on government contracts and which categories of costs are unallowable. In general, the FAR provides that a government contractor will be reimbursed for all reasonable costs required to perform the government contract. Reimbursable costs fall within two broad categories:

6

(1) direct costs, which can be directly identified and assigned to a particular contract on a consistent basis; and (2) indirect costs, which cannot be directly identified and assigned to a particular contract.

24.    Costs may only be reimbursed if they are allocable. Allocability is an accounting concept involving the ascertainment of contract cost; it results from a relationship between a cost and a cost objective such that the cost objective appropriately bears all of a portion of that cost.

25.    To determine whether a cost is allocable as a direct cost, courts generally apply a but-for test to determine whether, but for the contracting agency requirements, the contractor would have incurred the cost.

26.    By contrast, indirect costs must be allocated to a federal contract in proportion to the contract's direct costs. An indirect cost is allocable if it "benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received." 48 C.F.R. § 31.201-4(b). Such "beneficial" costs include supervision, utilities, taxes, and equipment used for contract work. An indirect cost is also allocable if it "is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown." 48 C.F.R. § 31.201-4(c). Necessary costs include officer salaries, selling costs, research and development costs, and bidding and proposal costs.

27.    The FAR sets forth specific rules for allocating general and administrative expenses (GAA, in Deloitte parlance). According to the FAR, GAA expense means "any management, financial, and other expense . . . which is for the general management and

7

administration of the [contractor] as a whole. [It] does not include those management expenses whose beneficial or causal relationship to cost objectives can be more directly measured by a base other than a cost input base representing the total activity of a [contractor]." 48 C.F.R. § 9904.410-30(a)(6).

28.    GAA expenses must be grouped in a separate indirect cost pool and allocated only to final cost objectives. 48 C.F.R. § 9904.410-40(a). Any costs that do not meet the definition of GAA, but have been classified as GAA expenses, can remain in the GAA expense pool unless they can be allocated to a cost objective on a beneficial or necessary basis. *Id.* § 9904.410-40(d). Only insignificant non-GAA expenses may be included in the GAA expense pool for allocation to the final cost objectives. *Id.* § 9904.410-40(c).

29.    Contractors recover indirect costs based on their indirect cost rate. Indirect cost rates are determined based on the indirect costs actually incurred, which are allocated to pools, such as overhead, and divided by a direct-cost allocation base, such as total direct labor hours.

30.    Each year, a contractor must submit to the federal government certified financial statements detailing actual direct and indirect costs incurred during the preceding year and an indirect cost rate proposal. 48 C.F.R. § 42.705-1(b)(1). The contractor must certify that its indirect expenses were properly allowable and allocable under the FAR's cost principles. *Id.* § 42-703-2(a). The government uses this information to reach a Negotiated Indirect Cost Rate Agreement ("NICRA") and to establish final

8

indirect cost rates. The resulting indirect cost rate applies to all contracts between a federal agency and that firm in the next year.

31.    Under the FAR, a contractor may not gerrymander cost pools by combining unlike cost objectives or separating like ones in order to manipulate an indirect cost rate. A contractor may not allocate a portion of certain indirect costs directly to some projects, and the remainder more broadly to all projects, unless there is a legitimate, documented reason for doing so. *See* 48 C.F.R. §§ 31.202(a); 31.203(b); 9904.401.

32.    Determining a contractor's indirect cost rate is a critical part of the federal contracting process and requires compliance with acceptable accounting principles. Fraud at this stage is particularly egregious because it inflates costs on all contracts between the government and the contractor.

**B. The False Claims Act**

33.    Originally enacted in 1863, the False Claims Act ("FCA") was substantially amended in 1986 by the False Claims Amendment Act. The 1986 Amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States. The Act was again amended in 2009 and 2010, further strengthening the law.

34.    The FCA provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $21,916 for each such claim, plus any increase as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1)-(2). The FCA empowers private persons who have information regarding false or

9

fraudulent claims against the government to bring an action on behalf of the government and to share in any recovery. *Id.* § 3730(b)(1), (d). The complaint must be filed under seal without service on any Defendants. *Id.* § 3730(b)(2). The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action. *Id.* § 3730(a), (b)(4).

35.     This suit is not based upon prior public disclosures found with sources of allegations or transactions that are encompassed by the definition of the term "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A), as amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010).

36.     To the extent that a public disclosure has occurred, Chen and Rigsbee qualify as original sources under the FCA, as defined under 31 U.S.C. § 3730(e)(4)(B), as amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010). Relators possess direct and independent knowledge of the information as a result of their employment with Deloitte. Chen and Rigsbee have voluntarily and affirmatively disclosed the allegations herein to the United States Government prior to filing this Complaint. *Id.* § 3730(e)(4).

## FACTUAL ALLEGATIONS REGARDING FALSE CLAIMS

### A. Deloitte's Federal Practice Group

37.     In 2009, Deloitte & Touche LLP acquired BearingPoint's North American Public Services practice, rapidly expanding its federal contracting practice. Nevertheless, Deloitte's federal practice remains a small portion of the firm's annual revenue.

38.    Following the acquisition of BearingPoint's federal practice, Deloitte assumed most of its existing federal contracts but eliminated the federally compliant financial management, accounting, and billing system. Instead, Deloitte incorporated the new business portfolio into the existing Deloitte Time and Expense ("DTE") system.

39.    DTE was designed for Deloitte's commercial practice. It requires that employees record all time and expenses each day and assign them to a unique 16-character "Work Breakdown Structure" code ("WBS") for billing purposes. WBS codes enable management and billing personnel to identify types of work that may be charged differently, if at all, such as project work versus administrative work.

40.    Shortly after Deloitte acquired BearingPoint, Deloitte received a notice from the Defense Contract Audit Agency ("DCAA") that DTE does not comply with federal contracting requirements. The DCAA required that Deloitte adopt a federally compliant system or risk being restricted from bidding on Federal contract opportunities.

41.    In response, Deloitte purchased a well-regarded contracting industry software package called DelTek CostPoint and implemented it across limited portions of the federal practice. Deloitte uses the system to produce purportedly federally compliant time and expenses data reports.

42.    However, critically, Deloitte's implementation of CostPoint was a farce. In fact, Deloitte made only cosmetic changes about how it records the majority of federal practice time and expenses. CostPoint was set up by Deloitte to merely pull in time and expense entries from DTE without any independent compliance check. Thus, the cost and

11

expense reports Deloitte provides to the government are a sham and do not, in fact, comply with federal contracting regulations.

## B. Deloitte Defendants' Federal Contracts

43.    Deloitte's federal practice, including Deloitte & Touche and Deloitte Consulting, bids on and performs contracts with a wide variety of federal agencies, including the Departments of Defense, Interior, Transportation, and State; the Centers for Disease Control and Prevention; the U.S. Postal Service; the U.S. Patent and Trademark Office; and the U.S. Agency for International Development.

44.    The majority of Deloitte's federal contracts are cost-plus contracts or time and materials contracts.

45.    Under the cost-plus reimbursement model, Deloitte is reimbursed for the direct costs attributable to the contract, such as salary for workers assigned to the contract project and materials used for the project. Deloitte also receives additional payments for overhead and general and administrative costs, contract fees, and bonuses. Generally, there is a cap on Deloitte's indirect cost rate.

46.    Deloitte's indirect cost rate for the prior year forms the basis of interim payments during a costs-plus contract term. Once the contract project is complete, the interim and final contract payments are reconciled with Deloitte's actual indirect cost rate for that year. If the actual indirect cost rate is lower than the interim payments, Deloitte must refund the overpayments. However, if the indirect cost rate for the prior year and the current year exceed the indirect cost rate cap, no refund is required. Deloitte's indirect cost rate also affects fees and bonuses, which are calculated based on total contract costs.

47.    Under the time and materials reimbursement model, Deloitte's indirect cost rate is the basis for the labor rate under the contract. As with cost-plus contracts, if Deloitte's indirect cost rate decreases from year to year, it must refund any overpayments.

**C. Deloitte Defendants' Scheme to Fraudulently Inflate the Indirect Cost Rate**

48.    Relators have identified three schemes through which Deloitte falsely inflates its indirect cost rate in violation of the FAR and cost accounting principles. In each instance, Deloitte improperly allocates direct costs and/or indirect non-general and administrative costs to the GAA pool. By intentionally inflating the GAA pool, Deloitte increases the indirect cost rate charged to the government.

49.    Deloitte is motivated to fraudulently allocate costs to the GAA pool to increase government payments. This artificially inflates the profitability of the federal practice and ensures that federal practice management receive high performance ratings and bonuses.

**1.  Deloitte Improperly Allocates Direct Costs to the GAA Cost Pool**

50.    Deloitte Defendants inflate the indirect cost rate by allocating certain unallowable direct costs to the GAA pool.

51.    As one example, Deloitte instructs its employees to charge weekly time incurred beyond contractual limits to GAA.

52.    Contracts frequently limit project work to 40 hours per week. If a Deloitte employee spends 60 hours on the project, the 20-hour overage is a direct cost because the

work can clearly be identified with a specific contract cost objective. However, it may not be charged to the federal agency under the terms of the contract.

53.    Accordingly, Deloitte employees should assign such overage hours to the non-billable ("NB") WBS code, which does not get charged to the federal agency as direct or indirect costs.

54.    In reality, Deloitte frequently instructs employees to assign the excess hours to the GAA WBS code. As a result, Deloitte improperly allocates this non-billable time to the GAA pool and ultimately passes the cost on to the government through its indirect cost rate.

55.    Second, Deloitte instructs its employees to charge unauthorized contract time to GAA.

56.    Contracts generally require approval from the federal agency for all Deloitte employees performing billable work on the project. On many projects, Deloitte assigns a subject-matter expert or extra employees who have not been approved by the federal agency to perform contract work.

57.    Some projects also require that all Deloitte employees performing billable work on the project obtain security clearances. In some cases, Deloitte assigns employees to perform contract work who do not have security clearances.

58.    The cost of work by unapproved Deloitte employees is a direct cost because it can clearly be identified with a specific contract cost objective. However, without approval or a security clearance, the extra employees' time may not be charged to the federal agency under the terms of the contract.

14

59.    Accordingly, Deloitte employees should assign such time to the NB WBS code, which does not get charged to the federal agency as direct or indirect costs.

60.    In reality, Deloitte frequently instructs employees to assign the hours worked by unapproved or uncleared employees to the GAA WBS code. As a result, Deloitte improperly allocates this non-billable time to the GAA pool and ultimately passes the cost on to the government through its indirect cost rate.

61.    For example, in 2016, Chen was assigned to a contract with the Department of State called the American Citizen Services Information System Development Modernization Enhancement ("ACS DME") project. The contract required Deloitte employees to secure an active or interim Secret security clearance, which Chen did not possess. Nevertheless, Deloitte assigned Chen to perform work to kick off the project and instructed him to charge his time to the GAA WBS code.

62.    Third, Deloitte instructs its employees to charge post-contract period work to GAA.

63.    Contracts generally include a definite period of work and require that all billable work be completed before a hard-stop date. Often, Deloitte performs closing project work beyond the hard-stop date without the approval of the federal agency. This work is a direct cost because it can clearly be identified with a specific contract cost objective. However, without approval, it may not be charged to the federal agency under the terms of the contract.

64.    Deloitte employees should assign time beyond the period of work to the NB WBS code.

15

65.    In reality, Deloitte frequently instructs employees to assign unapproved post-contract period work to the GAA WBS code. As a result, Deloitte improperly allocates this non-billable time to the GAA pool and ultimately passes the cost on to the government through its indirect cost rate.

### 2. Deloitte Improperly Allocates Non-GAA Indirect Costs to the GAA Cost Pool

66.    Pursuant to the FAR, GAA costs must be allocated in a separate pool from indirect costs that fall within a specific beneficial or necessary allocation base. Deloitte inflates its indirect cost rate by allocating certain non-GAA indirect costs to the GAA pool.

67.    One example of this practice is that Deloitte Defendants instruct employees who are not assigned to a specific federal contract to charge their idle time to GAA.

68.    Deloitte employees should assign their idle time to the Unassigned ("UNA") WBS code. Such time should be allocated to a non-GAA indirect cost pool because it cannot be identified with a specific contract, but may be necessary to Deloitte's overall business operation.

69.    By instructing employees to assign idle time to the GAA WBS code, Deloitte improperly allocates this time to the GAA pool, in violation of the FAR.

70.    This practice leads to substantial misallocation of non-GAA time to the GAA pool. For example, Deloitte instructed Rigsbee to charge over 500 hours of idle time to GAA over a period of several months.

71. Second, Deloitte instructs employees to assign time associated with independent research and development for new federal business and preparing bids and proposals to GAA.

72. Deloitte employees should assign such business "capture" work to an account-specific Other Pursuits ("OT") or Small Pursuits ("SP") WBS code or, for larger projects, a Local Practice Firm Development ("LPX") or Federal Practice Firm Development ("FPX") WBS code. These costs should be allocated to a non-GAA indirect cost pool because they cannot be identified with a specific contract, but they may be necessary to Deloitte's overall business operation.

73. For example, in January or February 2017, Chen reviewed an employee's time entries and noticed she charged internal practice development work to GAA. The employee should have used a special FPX or LPX WBS code set up by the sponsoring PPMD. Chen asked the employee, via email, why she was billing that time to GAA. She replied that the senior manager running the internal project told her that Deloitte was eliminating FPX and LPX WBS codes and that he was "ahead of the curve" by having her bill to GAA. She forwarded to Chen several emails from the senior manager. In the emails, the senior manager asserted that the PPMD above him had informed him of the elimination of FPX and LPX WBS codes. Chen later confirmed that Deloitte was not eliminating the FPX and LPX codes.

74. By assigning time spent performing "capture" work to the GAA WBS code, Deloitte improperly allocates this time to the GAA pool, in violation of the FAR.

17

75.    Third, Deloitte frequently instructs employees to assign time spent on "firm contribution" work, such as developing internal trainings, recruiting, participating in community service projects, and organizing social events, to GAA.

76.    In some cases, this time is allowable and allocable as an indirect cost necessary to the overall operation of the business. As such, it should be allocated to an applicable non-GAA WBS code, such as LPX, FPX, entertainment ("ENT"), recruiting ("REC"), or counseling ("CNS").

77.    For example, in August 2017, Chen received an email from firm leadership looking for volunteers to do free business strategy consulting for small businesses in Central Africa. This time should have been charged to the community service ("CMT") WBS code. Instead, the email stated clearly that volunteers were to charge their time to GAA.

78.    By assigning time spent performing "firm contribution" work to the GAA WBS code, Deloitte improperly allocates this time to the GAA pool, in violation of the FAR.

### 3. Deloitte Charges Inappropriate Expenses to GAA

79.    Pursuant to the FAR, certain expenses a contractor incurs are not allowed to be charged to the federal agency under the contract, either as direct costs or indirect costs. Other, allowable expenses must be properly allocated. Deloitte Defendants instruct employees to charge unallowable and/or unallocable expenses to GAA.

80.    Deloitte employees incur expenses relating to transportation, parking, off-site internet, specialized equipment purchases, food, and alcohol. In some cases, the

18

expenses are allowable and allocable as an indirect cost necessary to the overall operation

of the business, and they should be assigned to an appropriate WBS code. In other cases,

notably alcohol expenses, the expenses are unallowable and may not be allocated to the

federal contract.

81.     By assigning a wide range of expenses to the GAA WBS code, Deloitte

improperly allocates billable and non-billable expenses to the GAA pool, in violation of

the FAR. Where non-billable expenses are passed on to the government, this practice

ultimately inflates the indirect cost rate the government pays on every contract with

Deloitte.

**D. Deloitte Defendants' Efforts to Inflate the Indirect Cost Rate Violate the FCA**

82.     As described herein, the entries of unallocable and/or misallocated costs

contribute to Deloitte Defendants' general and administrative indirect cost pool, in

violation of the FAR and applicable cost-accounting principles.

83.     As a result, with every indirect cost rate proposal and claim for payment,

Deloitte falsely certifies its indirect expenses were properly allowable and allocable

under the FAR's cost principles. 48 C.F.R. § 42-703-2(a).

84.     Further, this practice falsely and fraudulently inflates the indirect cost rate

Deloitte applies to each and every federal contract it is awarded. Upon information and

belief, Deloitte has claimed and retained payments from the federal government based on

its inflated indirect cost rate.

19

85.    Deloitte conceals these unlawful practices by maintaining a sham federally compliant billing and reporting system and by directing employees to avoid discussing GAA in written communications.

## COUNT I
### False Claims Act – Presentation of False Claims
### [31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A), as amended in 2009]

86.    The allegations in the preceding paragraphs are re-alleged as if fully set forth below.

87.    As detailed above, Defendants repeatedly acted to violate the False Claims Act, 31 U.S.C. § 3729(a)(1), and, as amended, 31 U.S.C. § 3729(a)(1)(A), and their conduct is ongoing.

88.    As detailed above, Defendants knowingly violate law and regulations by allocating unallowable costs and/or misallocating costs to the general and administrative pool to inflate its indirect cost rate.

89.    Defendants' practice violates the Federal Acquisition Regulations and applicable cost-accounting principles.

90.    Defendants are liable for each and every claim for payment for work relating to federal contract in violation of the Federal Acquisition Regulations and applicable cost-accounting principles.

91.    Through the above-described practices, Defendants submit or cause to be submitted false claims to the United States and are liable for three times the amount of damages created by each and every such false claim made to the Government of the United States.

92.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of $11,181 to $22,363, plus an increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

### COUNT II
**False Claims Act – Making or Using False Record or
Statement to Cause Claim to Be Paid
[31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B), as amended in 2009]**

93.    The allegations in the preceding paragraphs are re-alleged as if fully set forth below.

94.    In furtherance of the illegal activities described herein, Defendants necessarily create false records material to support false claims in violation of 31 U.S.C. § 3729(a)(1)(B) and their conduct is ongoing.

95.    False records created by the Defendants include, but are not limited to, false certification of compliance with the Federal Acquisition Regulations and applicable cost-accounting principles and, specifically, false certification that Defendants' indirect expenses were properly allowable and allocable under the FAR's cost principles.

96.    Defendants are liable for three times the amount of damages created by each and every such false claim made to the Government of the United States.

97.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of $11,181 to $22,363, plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## FACTUAL ALLEGATIONS REGARDING COUNTS III – V

### A. Chen's Employment with Deloitte & Touche LLP

98.     Chen is male. Throughout his employment, Deloitte & Touche has been aware that Chen is male.

99.     Throughout the time period relevant to this Complaint, Chen was an "employee" and/or an "eligible employee" of Deloitte & Touche, and Deloitte & Touche was Chen's "employer" for purposes of the FCA, the Family Medical Leave Act, and Title VII.

100.     During his employment with Deloitte & Touche, Chen received top scores on his annual performance ratings, including the highest rating of 1 in 2013 and 2015 and a rating of 2 in 2014. Deloitte did not provide employees with rating information in 2016. In 2017, Chen was the highest rated manager in his group.

101.     From November 1, 2010 through Chen's termination on August 28, 2017, Principal 1 was a Federal Practice Principal, leader of Deloitte's Federal Data Analytics practitioners, and Chen's Partner Escalation Point. Principal 1 was responsible for overseeing staffing issues on Chen's projects, as well as administrative issues, such as approving Chen's leave and his pay. Principal 1 did not have oversight over Chen's substantive work.

102.     From approximately October 2014 through Chen's termination, Principal 2 was a Federal Practice Principal and Chen's Career Coach. As Chen's Coach, Principal 2 was supposed to assist Chen in setting his career track within Deloitte. Principal 2 did not have oversight over Chen's substantive work.

22

103.    Principal 2 is a holdover from the BearingPoint acquisition. He has substantial experience in federal contracting. In many instances, Principal 2 sought to ensure Deloitte's compliance with federal contracting regulations. Over time, however, Principal 2 was forced to accept the above-alleged fraudulent scheme.

**B. Chen's Opposition to Improper GAA Billing**

104.    Beginning in December 2015, Chen worked on Deloitte's contract with the Department of State called the American Citizen Services Information System Development Modernization Enhancement ("ACS DME") project. At the time he joined the project, Chen did not have an active or interim Secret security clearance. A Senior Manager informed Chen that because he did not have a clearance yet, he could not charge his time to any of the project codes that get billed to the client, per the terms of the contract.

105.    Chen completed and submitted his application for a Secret security clearance in January 2016. He told Principal 1 that he was unable to bill his time on the ACS DME project to the billable WBS codes because he did not have the necessary security clearance.

106.    Principal 1, Chen, and another manager later agreed that Chen would handle the administrative aspects of a new ACS DME workstream and charge his time to the GAA WBS code. Chen kept Principal 1 informed of the progress of the kick-off through emails and in-person conversations. Chen charged his time to GAA.

107.    In February 2016, Principal 2 reviewed Chen's timesheet, which showed a significant amount of time charged to the GAA code. Chen included notes to Principal 2

23

explaining which hours were related to the ACS DME project. Principal 2 rejected the GAA hours and sent a note to Chen that he could not charge that time to GAA.

108.    Over the next week, Chen and Principal 2 corresponded by email about the GAA hours. Chen explained that Principal 1 approved Chen's work and billing practices on the ACS DME project and that once Chen's interim security clearance was approved, he would reassign the GAA time to the project's billable WBS code.

109.    The next week, Chen spoke with Principal 2, and Principal 2 explained how billing to GAA should work, based on his experience at BearingPoint. Principal 2 told Chen that time charged to GAA is strictly limited to general and unavoidable administrative tasks, such as resolving IT issues, reserving meeting rooms, and responding to external audits.

110.    Principal 2 told Chen that any time mischarged to the GAA WBS code, either intentional or unintentional, pads Deloitte's indirect rates, which is a federal offense that could potentially get Deloitte blacklisted from doing any future contracting work with the federal government.

111.    Principal 2 also told Chen he was upset that they discussed the situation over emails because that was proof that the federal government could use to determine that Deloitte is violating the law.

112.    Principal 2 also told Chen that when Principal 2 first noticed Chen's GAA time, Principal 2 called Principal 1 to discuss the issue, and Principal 1 denied knowing what Chen was doing or how Chen was billing his work.

113.    As a result of these conversations, Chen immediately stopped working on the ACS DME project until he obtained his interim security clearance.

114.    Also in February 2016, another project manager asked Chen to investigate a miscalculation in financial reporting on the project. Chen said he could not do the work, in part, because the project's billable code had been shut down and he would not be able to account for his time. The manager told Chen to bill his time to GAA. Chen argued that this was wrong and refused to do the work.

115.    In March or April 2016, Chen had further discussion with Principal 2 about GAA billing. Chen had billed a small amount of time spent organizing a meeting to GAA. Principal 2 berated Chen for billing that time to GAA and told Chen to bill his time to an Other Pursuits ("OT") WBS code. Chen ultimately agreed to bill his time to the OT WBS code.

116.    Chen consulted his Talent Resource Manager about Principal 2's outburst. She instructed Chen not to report Principal 2 to Talent or to Ethics because there could be blowback or retaliation that would have serious negative consequences for Chen's career.

117.    In early or mid-summer of 2016, Chen agreed to assist a Senior Consultant with transitioning into her new project in Amman, Jordan. Her project manager instructed Chen via email to bill his time to GAA. As a result, Chen declined to assist.

118.    Chen also consulted with Compliance 1, a point of contact within Deloitte's Federal Time Compliance Unit, via email regarding the project manager's instruction. Compliance 1 agreed that Chen's time should be charged to the contract and not to GAA.

Chen shared Compliance 1's analysis with Principal 2, who angrily disagreed and told

Chen, "I don't know why you said no. This would have been fine for you to do."

119.    In January or February 2017, Chen witnessed a subordinate charging

internal practice development work to GAA. She claimed her PPMD said Deloitte was

eliminating the LPX and FPX codes. Compliance 1 confirmed to Chen that Deloitte was

not eliminating the LPX and FPX codes. Chen instructed the subordinate to get the

correct LPX or FPX WBS code for internal practice development work or distance

herself from the project.

120.    Continuing from January 2017 through Chen's termination, he saw and

questioned numerous expenses billed to GAA for individual client and internal projects,

such as reimbursements for happy hours, food for project All Hands meetings, meals,

snacks, and refreshments. These expenses were not properly chargeable to GAA and

should have been charged to either the project's non-billable client WBS code, a special

FPX or LPX WBS code, or the organizing PPMD's individual entertainment budget.

121.    When Chen rejected these expenses, his subordinates routinely informed

him via email that their senior manager or PPMD instructed them to charge the expenses

to GAA.

**C. Chen's FMLA Leave**

122.    In March 2016, Chen's wife was eight months pregnant with their first

child. Between December 2015 and February 2016, Chen informed Principal 1, Principal

2, project managers, his Talent Resource Manager, and Principal 3, and employees who

26

report to Chen, that he would be taking leave at and after birth to care for his wife and new child.

123.    Around March 2016, Chen received his interim Secret security clearance and resumed working on the ACS DME project as the full-time manager of the data quality workstream.

124.    In April 2016, Principal 3 met with Chen and told him that he would support Chen for a promotion to Senior Manager at the end of Performance Year 2016 or 2017, whenever Chen presented his case. Principal 3 indicated that his support was the result of Chen's success in selling and growing new work with the Department of State Bureau of Consular Affairs, demonstration of senior manager behaviors, and ownership of senior manager-level responsibilities.

125.    Around April 18, 2016, Chen submitted his leave request for two separate periods: (1) from April 25, 2016 to May 6, 2016, and (2) from August 1, 2016 to November 7, 2016. Principal 1, Principal 2, Chen's Talent Resource Manager, project leadership, and subordinates were aware that Chen was using this leave to care for his wife and new child. Principal 3 and Chen also discussed Chen's leave and transition plan for his absence.

126.    In June and July 2016, Chen trained Consultant 1 on the ACS DME project to fill in for Chen while he was out on leave. Chen also prepared his other project direct reports for his absence. When Chen began his leave, the ACS DME project's data analytics workstream was in excellent shape.

27

127.    Chen met with Principal 1 the day before he went on leave to walk through a data quality marketing PowerPoint presentation Chen had prepared. At the end of the meeting, Chen updated Principal 1 on his work to transition management of the ACS DME data quality workstream to Consultant 1 and to update all the relevant stakeholders. Principal 1 told Chen his work was satisfactory and told Chen to enjoy his leave.

128.    When Chen left, he had grown his workstream on ACS DME from three Advisory practitioners to five full-time Advisory practitioners. Chen also managed the time of several Deloitte Consulting practitioners on ACS DME who were not part of his workstream. Accordingly, Chen was on track to meet his Sales and Managed Revenue targets for Performance Year 2017. Chen's client was also happy with the work. However, Chen's utilization metric was low because of the time he spent waiting for his interim security clearance, the leave he took immediately after his daughter's birth in March, and the leave he took in April and May 2016 to care for his wife and child.

129.    In mid-August 2016, Talent sent Chen about seven or eight emails informing him that he had been assigned new employees to coach. These were new college graduates who were starting at Deloitte as their first full-time professional job. Deloitte instructs coaches to meet with new hires as soon after their start date as possible.

130.    Chen responded to the emails to remind Deloitte that he was on leave to care for his child and that he would not be able to meet with the new hires until he returned. He suggested that the new employees be assigned to other coaches.

131.    In several instances, Chen had to write to Talent to get them to respond and agree to the reassignment. In other instances, the new hires contacted Chen directly, long

after he asked Talent that they be reassigned. Chen then had to contact Talent to again request that the new hires be assigned to another coach.

132.    When it became apparent that Deloitte would not stop its attempts to assign Chen new hires, he ultimately accepted two of them. After this, Talent stopped sending emails about the new hires to Chen. In mid-September 2016, Chen met with the new hires for about an hour each. Chen brought his child to these meetings as he was caring for her at the time.

133.    Also in mid-September 2016, Chen learned that Deloitte had announced a new Family Leave policy, which was effective immediately. The new benefit provided sixteen weeks of paid leave instead of eight weeks. Part of the new Family Leave benefit was to allow people who were currently on Parental Leave to add the additional eight weeks the new Family Leave policy provided. Deloitte's new policy was widely covered by major media outlets.

134.    Chen requested, via email to Principal 1, an extension of his leave to care for his child for an additional eight weeks. Principal 1 approved Chen's request. The ELE Leaves Team confirmed on September 24, 2016, that Chen's extended leave was approved. As a result, Chen ultimately took leave until December 30, 2016.

135.    Around mid-September, Consultant 1, who was managing Chen's workstream on the ACS DME project, contacted Chen to recruit a new Advisory data analyst. By the end of October 2016, Chen was completely responsible for finding the new data analyst. He corresponded several times with Principal 1.

136.    In mid-October, Consultant 1 informed Chen that Principal 1 had reassigned Consultant 1 to a new project effective immediately. Consultant 2 was assigned to take over for Consultant 1, but was only able to dedicate eight hours per week to the ACS DME project. In addition, Consultant 1 did not have time to transition his work to Consultant 2 prior to departing for the new project. Thus, Chen was required to onboard Consultant 2 in order to ensure her successful transition on to the project.

137.    In mid-October, Consultant 2 told Chen she was unavailable to start working on the ACS DME project for another three weeks, long after Consultant 1 had departed the project.

138.    When Consultant 2 was able to join the project, Chen met with her at Deloitte's office on Duke Street in Alexandria, Virginia. He spent approximately two hours briefing her on the work, her role, her responsibilities, and expectations. Consultant 1 attended approximately fifteen minutes of the meeting before excusing himself to take a call. Following this meeting, Chen was reasonably assured Consultant 2 would perform adequately in the role.

139.    While Consultant 2 worked on the ACS DME project, from mid-October through December 2016, she emailed, texted, and called Chen regularly. Consultant 2 would inform Chen when illness or overriding commitments prevented her from completing her weekly eight hours of work on ACS DME. Consultant 2 submitted deliverables to Chen for his review before she sent them to the client and asked Chen to review her Weekly Updates before she sent them to Principal 1 and Principal 3.

140. Consultant 2 also asked Chen to call into conference calls and be available to jump in if anyone asked her a question she could not answer. However, often, Consultant 2 would initiate the calls, introduce the participants, and then unexpectedly hand the call off to Chen and put herself on mute.

141. Firm management expected Chen to participate in the calls. For example, on one occasion, Principal 3 asked Chen via email if he would be on the call. When Chen confirmed that he could be, Principal 3 replied: "Good. Your presence is important to moving this potential work forward."

142. In about November 2016, Principal 2 asked Chen to talk with him. Principal 2 started by telling Chen that he was confused that Chen had not followed up on their monthly meetings to line up advocates for Chen's promotion case in 2017. Chen reminded Principal 2 that he was out on leave to care for his child. Chen told Principal 2 that he felt pressured into supporting Talent, Consultant 1, and Consultant 2 while he was on leave to care for his child. Principal 2 agreed that this was an unfair intrusion on Chen's leave.

143. In November and December 2016, ACS DME team members called Chen multiple times to complain about Consultant 2's work.

**D. Chen Returns to Work and Deloitte Begins Criticizing His Performance**

144. On January 3, 2017, Chen returned to work. He received uniform feedback from his team that his return was welcome. He also learned that Consultant 2 did not complete several critical tasks on the ACS DME project.

145.    Chen scheduled a meeting with Principal 2 and Principal 1 on January 5, 2017 to discuss his work on the ACS DME project and his case for promotion at the end of the 2017 performance year in March 2017. During this meeting, both Principal 2 and Principal 1 criticized Chen in several ways.

146.    Despite working during his leave, Principal 1 and Principal 2 asserted that Chen was a low performer and that his utilization was low. However, they did not discuss any other manager-level performance expectation that Chen was not meeting.

147.    They also told Chen that he did not receive any support within Advisory at the mid-performance-year point (November 2016) for promotion. Principal 2 blamed Chen for not lining up PPMDs within Federal Advisory who could advocate for a promotion for him at the performance year mid-point and end-point and discounted the advocates Chen had lined up. Principal 2 did not substantively respond when Chen reminded Principal 2 that he had been out on leave for six months.

148.    Principal 1 told Chen that Chen had roughly until the end of August 2017 to make a convincing case for promotion in performance year 2018 or Chen would be at risk of being terminated from the firm.

149.    Neither Principal 2 nor Principal 1 had criticized Chen's performance or utilization prior to Chen's leave.

150.    On January 13, 2017, Principal 1 sent Chen an email informing him that the firm had identified him as a Low Performer. The email was generic and did not contain any specific details about Chen's alleged poor performance. The email directly contradicted the data in Deloitte's official performance measurement system, which

32

showed that Chen was the highest rated manager within his group, as well as data points relating to sales, managed revenue, compliance, client feedback, and upward feedback, where Chen excelled.

151.    Chen had also earned a second professional certification as a Certified Fraud Examiner in performance year 2017, of which Principal 2 was aware. And, as Chen informed Principal 2 and Principal 1, he was highly valued within his Department of State account.

152.    Chen forwarded data on his outstanding performance and additional supporting data points to Principal 2 and Principal 1, but received no response.

153.    In late June 2017, Chen and Principal 2 again discussed Chen's utilization for performance year 2017. Principal 2 told Chen that Talent had informed him that Chen's final utilization for performance year 2017 was thirty-nine percent and that was the reason Talent had marked Chen a Low Performer. Chen reminded Principal 2 that he had a significant amount of leave in 2016 and that he had spent a month waiting for his interim security clearance to be processed. Again, Principal 2 did not respond substantively to Chen's comments.

**E. Chen Receives Praise for 2017 Performance**

154.    By the end of performance year 2017 (March 2017), Chen was the highest rated manager in his group and had outperformed all of his peers. Chen also exceeded his sales goal by about $1,500,000, met his managed revenue goal, and received outstanding client and internal feedback. He also received outstanding upward and training facilitator feedback and all of his compliance and independence requirements were up to date.

155.   In March 2017, Principal 3, Principal 4, and Senior Manager 1 sent emails praising Chen and his work to Principal 2, Principal 1, and Group Leader 1. Group Leader 1 also said to Chen, "I've been receiving a barrage of great feedback on you... keep up the great work."

156.   In March or April 2017, Senior Manager 1 told Chen that he was performing at the Senior Manager level and urged Chen to go up for promotion in performance year 2017. Principal 2 also received positive feedback about Chen from Principal 4.

157.   Also in March or April 2017, the success of Chen's Department of State ACD DME data analytics workstream was featured in the Deloitte internal quarterly newsletter, which is distributed to thousands of Deloitte employees.

158.   On June 22, 2017, the Department of State awarded Chen and his team certificates for outstanding service and for improving the Department's ability to provide services to millions of overseas American citizens. Principal 3 accepted the award in Chen's place. Principal 1 and nearly everyone on the projects congratulated Chen. Such recognition from a client is a rare honor in Deloitte.

159.   In late June 2017, Principal 2 told Chen to line up individuals to advocate on Chen's behalf for a promotion at the end of the year.

160.   On August 4, 2017, Chen presented a summary of his projects at the State Department account All Hands Meeting. Chen received very good feedback from the group on his success.

34

161.    On about August 21, 2017, Chen met with Senior Manager 1 to discuss increasing his Managed Revenue to $3,500,000 to support his promotion case. This is a difficult metric. After the meeting, both Chen and Senior Manager 1 were confident that Chen would be able to meet the Managed Revenue metric.

**F.  Despite Chen's Success, Deloitte Characterizes Him as a Low Performer**

162.    Despite positive reviews of Chen's 2017 performance, on June 23, 2017, Chen received a second official email from Principal 1 informing Chen that Deloitte had identified him as a chronic Low Performer.

163.    At the time, Chen's performance was outstanding and his metrics were high enough to support that assessment.

164.    In late June 2017, Chen met with Principal 2. Principal 2 asked for Chen's list of advocates for his promotion. Upon reviewing the list, Principal 2 said, "This could work," and "If you have all of these people" on board, Principal 2 could sell Chen's promotion case.

165.    Principal 2 instructed Chen to expand his list of advocates. Chen sent this expanded list to Principal 2 in early August 2017.

166.    In mid-August 2017, Advisory Talent conducted a nationwide call to answer questions about the performance year 2017 evaluation process and how it factors into annual compensation adjustments. During the call, Chen asked: "I know a practitioner who's been hitting all his metrics and getting great performance evaluations, but had low utilization resulting from (1) needing to take approved Family Leave and PTO to care for an ailing family member, and (2) having to wait for a period of time

unbillable while his security clearance was being processed. He is not a low performer in any other way. But he was marked as a low performer. Is this possible?"

167.    The National Talent Lead responded by saying, in that case, if there were not any issues aside from the depressed utilization, it was inappropriate to label that person a low performer.

**G. Deloitte Terminates Chen's Employment**

168.    On August 23, 2017, Chen was scheduled to meet with Principal 2 to make progress on his promotion case. However, Principal 2 cancelled the meeting.

169.    On August 24 or 25, 2017, Principal 1 sent Chen a calendar invite for a meeting on August 28, 2017, to check in with Chen.

170.    On August 28, 2017, Chen met with Principal 1 and Human Resources. Principal 1 told Chen he was being separated from the firm because Chen was a chronic low performer and was not receptive to coaching. Principal 1 did not provide specific examples.

171.    Chen reminded Principal 1 that Chen was the highest performing manager with his group for performance year 2017, that Chen met all of his compliance requirements and hit all of his metrics, except for utilization due to his Family Leave, and received outstanding feedback from within and outside of the firm. Principal 1 asserted, incorrectly, that each issue that contributed to the separation decision had been previously discussed with Chen in detail and that he did not want to "relitigate" the issues.

172.    As of Chen's termination, performance year 2018 was slightly less than halfway through. Chen's utilization was at approximately sixty percent, lower than his

target of seventy-five percent, because of a delay in kicking off a new project workstream. The project leaders had assured Chen that he would be able to meet or exceed his utilization target by year-end. Chen's project snapshots were described to him as outstanding, as were his client feedback, internal feedback, and feedback survey results. He anticipated achieving approximately $10,000,000 in sales and $3,500,000 in managed revenue. All of Chen's compliance requirements were up to date.

## H. Female Employees Did Not Face Adverse Consequences for Using Family Leave

173.   During his employment with Deloitte, Chen observed that several of his female colleagues became pregnant and used leave after giving birth.

174.   In 2012, Female Employee 1, a Senior Manager at the time, took leave after the birth of her child. At the time, Female Employee 1 reported to Principal 1. Principal 1 did not require her to work while she was on leave after the birth of her child and did not criticize her for her low utilization metric. Female Employee 1 was later promoted to Managing Director.

175.   From about June 2014 to November 2014, Female Employee 2, a Manager at the time, took leave after the birth of her child. At the time, Female Employee 2 reported to Principal 1. Principal 1 did not require her to work while she was on leave after the birth of her child and did not criticize her for her low utilization metric. On or about August 2016, Female Employee 2 was promoted to Senior Manager.

176.   In 2015, Female Employee 3, a Manager at the time, took leave following the birth of her child. At the time, Female Employee 3 reported to Principal 1. Principal 1 did not require her to work while she was on leave after the birth of her child and did not

criticize her for her low utilization metric. Upon information and belief, Female Employee 3 remains employed with Deloitte.

177.    From about March 2017 to August 2017, Female Employee 4, a Senior Consultant, took leave after the birth of her child. At the time, Female Employee 4 reported to Principal 5. She was not required to work while on leave after the birth of her child and was not criticized for her low utilization metric. Female Employee 4 remained employed with Deloitte until January 2018 when she left voluntarily for a new position.

**COUNT III**
**False Claims Act – Retaliation**
**As To Plaintiff Chen**
**[31 U.S.C. § 3730(h)]**

178.    The allegations in the preceding paragraphs are re-alleged as if fully set forth below.

179.    Chen engaged in protected activity under the False Claims Act when he repeatedly took efforts to stop Deloitte employees from falsely inflating Deloitte's indirect cost rate charged to federal clients by objecting to Deloitte's practice of inappropriately charging to GAA and thereby allocating unallowable costs and/or misallocating costs to the general and administrative pool.

180.    The Deloitte Defendants, through their employees and principals, unlawfully subjected Chen to and tolerated retaliation against Chen because he engaged in protected activity under the False Claims Act.

181.    Defendants did not stop or remedy the retaliatory conduct toward Chen, despite having knowledge of that conduct.

38

182.    Defendants have no legitimate business reasons for the adverse actions it has taken against Chen. Any stated reasons for the adverse actions against Chen are pretext for retaliation in violation of the False Claims Act.

183.    The adverse actions at issue in the complaint occurred under circumstances that raise a reasonable inference of unlawful retaliation because of Chen's protected activity.

184.    Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h) to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and federal investigations.

185.    Chen has sustained damages as the result of Defendants' illegal retaliation, including, but not limited to, lost wages, lost bonuses, damage to his career, and emotional, mental, and physical distress.

186.    Chen is entitled to such legal and/or equitable relief as will effectuate the purposes of the FCA, including but not limited to economic, compensatory, and punitive damages, as well as reasonable attorneys' fees and costs.

### COUNT IV
**FMLA Interference, Discrimination, and Retaliation
As To Plaintiff Chen
[29 U.S.C. § 2615(a)(1) and (2)]**

187.    The allegations in the preceding paragraphs are re-alleged as if fully set forth below.

188.    Defendants are engaged in commerce and employ fifty or more employees for each working day during the year.

189.    Defendants are an "employer" for purposes of the FMLA.

190.    Defendants employed Chen on a full-time basis from November 1, 2010 until his termination in August 2017.

191.    During the twelve months preceding Chen's child's birth in March 2016, Chen worked at least 1,250 hours for Defendants.

192.    Chen gave sufficient and appropriate notice of his need for FMLA qualifying leave and Defendants approved his request for that leave.

193.    Most of Chen's twelve weeks of FMLA leave ran concurrently with his leave under Deloitte's Family Leave policy in 2016.

194.    Defendants, through their employees and principals, unlawfully interfered with Chen's FMLA leave by requiring him to work during the leave he took to care for his wife and/or new child.

195.    Defendants had knowledge of the work it required Chen to perform during the leave he took to care for his wife and/or new child.

196.    Chen objected several times to being required to work during his leave to care for his wife and/or new child.

197.    Because Chen was required to work during his leave to care for his wife and/or new child, Deloitte willfully denied Chen the right to leave under the FMLA.

198.    Defendants, through its employees and principals, unlawfully retaliated against Chen for taking FMLA qualifying leave to care for his wife and/or child.

199. Upon Chen's return to work, Defendants began criticizing Chen's performance and ultimately terminated Chen's employment.

200. Defendants criticized Chen's performance and terminated Chen's employment (and thus prevented Chen from being promoted to Senior Manager) because of Chen's request for and use of FMLA qualifying leave and because of Chen's objections to being required to work while on FMLA qualifying leave.

201. The adverse actions at issue in this complaint occurred under circumstances that raise a reasonable inference of unlawful discrimination based on Chen's use of FMLA qualifying leave.

202. Defendants have no legitimate business reasons for the adverse action it has taken against Chen. Any stated reasons for the adverse actions against Chen are pretext for FMLA retaliation.

203. Chen has sustained damages as the result of Defendants' illegal discrimination, including but not limited to, lost wages, lost bonuses, and damage to his career.

204. Chen is entitled to such legal and/or equitable relief as will effectuate the purposes of the FMLA, including but not limited to economic and liquidated damages, as well as reasonable attorneys' fees and costs.

## COUNT V
### Gender Discrimination and Retaliation
### As To Plaintiff Chen
### [42 U.S.C. § 2000e-2(a)(1) and -3(a)]

205.   The allegations in the preceding paragraphs are re-alleged as if fully set forth below.

206.   Defendants, through its employees and principals, unlawfully subjected Chen to and tolerated discrimination against Chen because of his gender (male) during and after his leave to care for his wife and/or new child.

207.   Defendants did not stop or remedy the discriminatory conduct toward Chen, despite having knowledge of that conduct.

208.   Defendants have no legitimate business reasons for the adverse actions they have taken against Chen. Any stated reasons for the adverse actions against Chen are pretext for gender discrimination.

209.   The adverse actions at issue in this complaint occurred under circumstances that raise a reasonable inference of unlawful discrimination based on Chen's gender.

210.   Chen exhausted his administrative remedies through the Equal Employment Opportunities Commission, which issued a right-to-sue letter relating to this claim on April 30, 2019.

211.   Chen has sustained damages as the result of Defendants' illegal discrimination, including but not limited to, lost wages, lost bonuses, damage to his career, and emotional, mental, and physical distress.

212.    Chen is entitled to such legal and/or equitable relief as will effectuate the purposes of Title VII, including but not limited to economic, compensatory, and punitive damages, as well as reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Relators request that judgment be entered against Defendants, order that:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

2.    Defendants pay not less than $11,181 and not more than $22,363 for each violation of 31 U.S.C. § 3729, plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990 and three times the amount of damages the United States has sustained because of Defendants' actions;

3.    Relators be awarded the maximum "relator share" allowed, pursuant to 31 U.S.C. § 3730(d);

4.    Relators be awarded all costs of this action, including attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d);

5.    Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

6.    Defendants disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

7.    Relators be awarded all other damages to which they are entitled, including compensatory and punitive damages;

43

8.      Plaintiff Chen be awarded reinstatement, economic damages, including

back pay and front pay, compensatory damages, punitive damages, liquidated

damages, reasonable attorneys' fees and costs, and prejudgment interest; and

9.      The United States and Relators recover as such other relief as the Court

deems just and proper.

Respectfully submitted,

Mark Hanna (Virginia Bar No. 45442)
Roseann R. Romano
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
Phone: (202) 223-2620
Fax: (202) 296-9600
mhanna@murphypllc.com
rromano@murphypllc.com